UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN PETR, Chapter 7 Trustee for the Estate of Maria L. Burton, <br> Plaintiff, <br><br> vs. <br><br> J.C. PENNEY CORPORATION, INC., <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | 1:11-cv-00825-RLY-MJD |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this diversity case, John Petr, Chapter 7 Trustee for the Estate of Maria L. Burton ("Burton"), brings a multitude of state law claims against J.C. Penney Corporation, Inc. ("JCP") arising out of Burton's detention and arrest for allegedly engaging in the act of, or participating in, the theft of merchandise from the JCP store located in the Castleton Square Mall in Indianapolis, Indiana. JCP now moves for summary judgment on all of Burton's claims. For the reasons set forth below, the court **GRANTS** JCP's motion.

**I.   Factual Background**

On January 25, 2011, Burton went to Castleton Square Mall with her sister, Delisha Burton ("Delisha") and Delisha's friend, Ashlyn Owens ("Ashlyn"). (Deposition of Maria Burton ("Burton Dep.") at 22). They entered the JCP store and shopped in various departments, at times shopping together and at other times, shopping separately.

1

(*Id.* at 23). JCP's Loss Prevention Supervisor Lisa Herrmann ("Officer Herrmann") and Loss Prevention Officer Brad Graves ("Officer Graves") observed Ashlyn and Delisha each select three items of fragrance and placed the merchandise in a mesh shopping bag. (Affidavit of Lisa Herrmann ("Herrmann Aff.") ¶ 4; Affidavit of Bradley Graves ("Graves Aff.") ¶¶ 4-5). Ashlyn and Delisha met up with Burton in the Juniors section and the three shopped for clothes. (Herrmann Aff. ¶ 5; Graves Aff. ¶ 7). Burton selected two tops and a pair of pants, and entered into the dressing room. (Video 2, Camera 16 5:30:00 -5:31:40). Ashlyn selected a juniors sweater from the display and several other items and proceeded into the dressing room approximately three minutes later, followed by Delisha. (Herrmann Aff. ¶ 5; Graves Aff. ¶ 7; *see also* Video 2, Camera 16: 5:30:00-5:34:30).

Officer Herrmann went into the dressing room and testified that, based on her observation below the doors of the dressing room stalls, Burton and Ashlyn were in the same stall. (Herrmann Aff. ¶ 6). Burton disputes this fact. (Burton Dep. at 26).

Delisha came out of the dressing room several minutes before Burton and Ashlyn. (Video 2, Camera 16: 5:39:37-5:42:19). Burton, with clothes in hand, turned toward the right; Ashlyn put her clothes down near the dressing room exit. (*Id.,* 5:42:20-5:42:30). After the three women left the dressing room, Officer Herrmann visually inspected the dressing room stalls that she believed the women used, and did not find any fragrance merchandise. (Herrmann Aff. ¶ 9).

Burton, Ashlyn and Delisha eventually met up at the exit of the store. (Burton

Dep. at 30). Officer Herrmann and Officer Graves testified that they, along with fellow Loss Prevention Officer Wayne Pinkerton ("Officer Pinkerton"), stopped the three women and asked them to return to the store. (Herrmann Aff. ¶¶ 10-11; Graves Aff. ¶ 13). Burton refused and kept walking into the interior of the mall. (Herrmann Aff. ¶ 11; Graves Aff. ¶ 13; Burton's Answer to Interrogatory No. 4 ("I refused to return with the employee because I had done nothing wrong.")). Burton then called her mother and walked out of the mall. (*Id.* at 33-34). Ashlyn confessed to shoplifting three items of fragrance and one item of clothing, leaving three items of fragrance unaccounted for. (Herrmann Aff. ¶¶ 12-13; Burton Dep. at 49, 59).

Officer Graves maintained observation of Burton while she exited the mall and proceeded to the Longhorn Steak House restaurant in the mall outlot. (Graves Aff. ¶ 14). During this time frame, Officer Graves was informed via radio communication that some, but not all, of the JCP merchandise had been recovered. (*Id.* ¶ 15). Upon questioning, Officer Graves informed Mall Security Director Chad Bunner of what he had observed, and Security Director Bunner called the Indianapolis Police Department ("IMPD"). (Graves Aff. ¶¶ 17-18).

Burton entered the restaurant and went immediately into the restroom. (*Id.* at 39). Officer Ivanov of the IMPD arrived while Officer Graves was outside of the restaurant. (Graves Aff. ¶ 18). Officer Ivanov and Officer Graves entered the restaurant. (Burton Dep. at 41; Graves Aff. ¶ 20). Officer Graves opened the restroom door, told Burton to exit, and checked the restroom trash can for stolen merchandise. (Burton Dep. at 41). As

3

soon as Burton walked out of the restroom, Officer Graves identified her as the person he believed was involved in the act of shoplifting with Ashlyn. (Graves Aff. ¶ 20). She was immediately handcuffed by Officer Ivanov and escorted across the parking lot into the JCP loss prevention office, where she was detained for approximately an hour. (Burton Dep. at 44, 51). Present were the JCP store manager, Officer Graves, Officer Pinkerton, Ashlyn, and Burton. (*Id*. at 50). The officers did not find any stolen merchandise on Burton's person or in her purse. (Graves Dep. at 32, 36; Burton Dep. at 52-53).

Burton was transported to the Marion County Jail where she was booked and charged with theft and conversion. (Burton's Answers to Interrogatory No. 4). Master Commissioner Murphy of the Marion Superior Court, Criminal Division, entered a judicial finding of probable cause for the arrest of Burton. (Marion County Case Chronology for Cause No. 49 F07 1101 CM 005612).

On March 25, 2011, Burton's case was dismissed due to "evidentiary problems." (*See* Motion to Dismiss). The following month, the record relating to Burton's arrest was expunged by the Marion Superior Court. (*See* Order Granting Petition for Expungement).

## II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The non-moving party, however, may not rest on mere allegations or denials in its

pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. Stated differently, only disputes over material facts – i.e., "facts that might affect the outcome of the suit under the governing law" – will preclude the entry of summary judgment. *Id*. Disputes over immaterial or irrelevant facts will not. *Id.* at 247-48. When determining whether a genuine issue of material fact exists, the court views the record and all reasonable inferences in the light most favorable to the nonmoving party. *Id*. at 255.

### III. Discussion

Plaintiff's Amended Complaint asserts the following causes of action under Indiana law: negligence, abuse of process, false light publicity, defamation, false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress, and negligent infliction of emotional distress. Before reaching the merits of these causes of action, the court must first address whether JCP and its loss prevention officers are entitled to immunity under Indiana's common law qualified communications privilege.

#### A. Qualified Privilege

"A qualified privilege protects 'communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a

5

person having a corresponding interest or duty.'" *Holcomb v. Walter's Dimmick Petroleum, Inc.*, 858 N.E.2d 103, 106 (Ind. Ct. App. 2006) (quoting *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992)). Because of the compelling public interest in encouraging citizens to report criminal activity, communications to law enforcement are qualifiedly privileged. *Id*. A communication loses its privileged status if the plaintiff can show that the privilege has been abused. *Id*. "Abuse of the privilege is proven by showing that: '(1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth.'" *Id*. (quoting *Bals*, 600 N.E.2d at 1356).

Burton argues that Officer Graves, Officer Herrmann, and Officer Pinkerton are not entitled to the qualified privilege because they made statements to the IMPD implicating Burton that were made without belief or grounds for belief in their truth. In support of Burton's claim, Burton argues that the statements made in the Affidavit of Probable Cause authored by Officer Graves contained a multitude of "glaring misstatements" and purposefully excluded the fact that neither Officer Graves nor Officer Herrmann saw Burton in possession of the missing merchandise.

"[T]he privilege exists to protect tipsters from liability for making inaccurate reports." *Williams v. Tharp*, 934 N.E.2d 1203, 1210 (Ind. Ct. App. 2011). Accordingly, in determining whether one is entitled to the qualified privilege based upon the third circumstance (whether the statement was made without belief or grounds for belief in its

6

truth), the relevant inquiry is not the factual accuracy of one's statements to law enforcement; "the critical issue is whether the alleged defamations were made . . . without belief or grounds for belief as to truth." *Bals*, 600 N.E.2d at 1357. The Indiana Court of Appeals decision in *Tharp*[1] is illustrative of this point. In *Tharp*, two male customers of Papa John's brought claims against Tharp and Papa John's for defamation, false imprisonment, negligence, and intentional infliction of emotional distress, and additional claims against Papa John's for negligent hiring, retention, and supervision, arising out of their detention by Officer Frolick of the Westfield Police Department based upon a tip from a Papa John's delivery driver, Tharp, that one of them (Kelsey) had "pulled a gun" inside a Papa John's restaurant. 934 N.E.2d 1203, 1205 (Ind. Ct. App. 2011). What Tharp thought was a gun was actually a black fanny pack with silver reflective material. *Id*. at 1206. Thus, Officer Frolick found no gun, and the men were released. *Id*. at 1207. The plaintiffs argued that Tharp's statements to Officer Frolick were without belief or grounds for belief in their truth because: (1) Officer Frolick testified that it was not possible to see what Tharp claimed he saw from where he had been standing on the day of the incident; (2) none of the other three Papa John's employees saw a gun; (3) Tharp admitted to prior misconduct; and (4) Tharp gave inconsistent descriptions of the gun. *Id*. at 1210.

---

[1] The Court ultimately found that the trial court's denial of the plaintiff's motion for relief from judgment, based upon Tharp's plea of guilty for false reporting, was erroneous, and remanded the case for a consideration of whether Tharp knew his accusation was false when he made it. *Tharp*, 934 N.E.2d at 1219.

The Indiana Court of Appeals affirmed the trial court's entry of summary judgment in favor of Tharp and Papa John's, finding that Tharp's statements were subject to the qualified privilege as a matter of law. *Id*. at 1212. The Court found that the most compelling piece of evidence that Tharp abused the privilege was Officer Frolick's testimony that Tharp could not have seen what he claimed from where he was standing. *Id*. at 1212. Although Officer Frolick's testimony supported a slight inference that Tharp fabricated his account, the Court found it significant that: (1) Tharp's description of the alleged gun fit the characteristics of Kelsey's fanny pack, and the location of the fanny pack was in the same location as where he said the gun would be; (2) Tharp accurately described Kelsey's appearance and apparel, and (3) Tharp accurately described Kelsey's friend's car and license plate number. *Id*. The Court concluded that the consistencies in Tharp's report to Officer Frolick were too great a coincidence to support a reasonable inference that Tharp invented the story. *Id*. "Whether Tharp's misperception was speculative, negligent, or even reckless, it was not so obviously mistaken to permit a reasonable inference that he lied." *Id*.

In the present case, the following facts were testified to consistently by Officer Graves and Officer Herrmann: (1) They, along with Officer Pinkerton, observed Ashlyn and Delisha pick up six fragrance items and place them in a mesh bag; (2) Burton entered the dressing room area, followed by Ashlyn and Delisha; (3) Officer Herrmann entered the dressing room area and believed that Ashlyn and Burton were in the same stall; (4) Officer Herrmann did not find the missing merchandise after the women left the stall; (5)

Officers Graves, Herrmann, and Pinkerton stopped the women as they exited the store, but Burton refused to stop; (6) Ashlyn confessed to shoplifting; and (7) Officer Graves, Officer Herrmann and Officer Pinkerton reasonably believed, based upon their observations, that Burton was a participant in, or an accomplice to, Ashlyn's theft. (Herrmann Aff. ¶ 16; Graves Aff. ¶ 12; Pinkerton Aff. ¶ 5). Burton points to slight inconsistencies in their observations based upon the surveillance video that is in evidence. However, these inconsistencies are not so glaring as to permit a reasonable person to believe that their reports to Officer Ivanov were fabricated. For example, she takes issue with Officer Graves' statements in the Affidavit of Probable Cause that state that Ashlyn and Burton shared the same dressing room stall, and that they exited without the fragrance merchandise. Officer Graves learned that they shared the same dressing room stall from Officer Herrmann. (Graves Aff. ¶ 9). To the extent Officer Herrmann was wrong in her assessment that Burton shared a stall with Ashlyn, her misperception, without more, is insufficient to permit a reasonable inference that Officer Herrmann purposefully lied or exhibited a knowing disregard for the truth. The surveillance video does show the two entering the dressing room minutes apart and exiting at the same time. Moreover, while neither Officer Graves nor Officer Herrmann saw Burton with the subject merchandise in hand, this fact is not determinative of Burton's innocence in light of the fact that she was seen shopping, trying on clothing in the same dressing room area, and seen leaving the dressing room area and store with Ashlyn, who was found with three fragrance items and a top in her possession. In addition, Officer Herrmann testified that

she could not find the other three missing fragrance items, and informed Officer Graves of that fact. Delisha was quickly released from the officers' custody; thus, the officers logically concluded that Burton may have had them. Lastly, Burton did not stop and speak to Officers Graves, Herrmann, and Pinkerton when they asked her to answer a few questions. While her failure to stop is not evidence of guilt, her decision to ignore their request certainly raised their suspicion. For these reasons, the court finds that JCP Loss Control Supervisor Herrmann and Loss Control Officers Graves and Pinkerton are entitled to the qualified privilege for reporting and assisting law enforcement with investigating and apprehending individuals they suspected of engaging in criminal activity. Accordingly, the statements they made to law enforcement on January 25, 2011, regarding their suspicion that Burton had engaged in the act of theft or served as an accomplice to Ashlyn's theft, are not actionable.

### B.  Merits

Even if the officers are not entitled to the qualified privilege, as explained below, Burton's claims fail on the merits.

#### 1.  Negligence

Burton alleges that JCP failed to adequately train and supervise their loss prevention officers to prevent an unlawful arrest. To recover for negligence under Indiana law, a plaintiff must establish: (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff; (2) a failure on the part of the defendant to conform his conduct to the requisite standard of

care; and (3) an injury to the plaintiff proximately caused by the breach. *Patterson v. Seavoy*, 822 N.E.2d 206, 211 (Ind. Ct. App. 2005). "Absent a duty, there can be no breach and therefore, no recovery in negligence." *Id*.

Burton argues that JCP had a duty to adequately train and supervise its employees. As support of this proposition, Burton cites to Officer Graves' and Officer Herrmann's testimony stating that they did not follow JCP protocol because they admittedly never saw Burton in possession of missing merchandise. (Graves Dep. at 20-21; Herrmann Dep. at 17; *see also* Graves Dep. at 8 (testifying that before making a stop, JCP protocol requires its loss prevention officers to see the person select merchandise, maintain visual contact, have uninterrupted surveillance, make sure the person passes all points of payment, and leave the store); Herrmann Dep. at 8 (same)). In *Wal-Mart Stores, Inc. v. Wright*, the Indiana Supreme Court held that a company's failure to follow internal protocol may be evidence of negligence, but is not determinative of a company's duty of care. *See Wal-Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 894 (Ind. 2002) ("The law has long recognized that failure to follow a party's precautionary steps or procedures is not necessarily failure to exercise ordinary care.") (citing 57A AM.JUR.2D NEGLIGENCE § 187 at 239 (1998))). The Court reasoned that a company's written protocols may, in fact, exceed that which the law requires of a reasonable person under the circumstances. *Id*.

Moreover, Burton failed to cite any evidence in the record showing that JCP failed to train or supervise its loss prevention officers. *See Miller v. Wal-Mart Stores, Inc.*, 580 N.W.2d 233, 238 (Wis. App. 1999) (concluding that if Wal-Mart failed to properly hire,

11

train, or supervise its employees, it breaches its duty to shoppers at the store). The court learned from reading the depositions of Officer Graves and Officer Herrmann that they did, in fact, receive training from JCP regarding when it is permissible to stop and detain a shopper. (Graves Dep. at 8; Herrmann Dep. at 8). For these reasons, the court **GRANTS** JCP's motion for summary judgment on Burton's claim of negligent training and supervision.

### 2.     Abuse of Process

Burton alleges that Officer Graves' statements made in his sworn Affidavit of Probable Cause, and his failure to follow JCP's internal protocols, constitutes an abuse of process. Abuse of process consists of "(1) an ulterior purpose, and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Lindsay v. Jenkins*, 574 N.E.2d 324, 326 (Ind. Ct. App. 1991). The party asserting this claim "must have some evidence tending to show that the defendant used process for an end other than that for which it was designed." *Conner v. Howe*, 344 F.Supp.2d 1164, 1175 (S.D. Ind. 2004) (citing *Comfax Corp. v. North American Van Lines, Inc.*, 638 N.E.2d 476, 481 (Ind. Ct. App. 1994)). "Mere negligence . . . does not suffice to establish an improper purpose." *Id*.

Burton has put forth no evidence tending to show that Officer Graves used the legal process for an end other than for which it was designed. She argues only that Officer Graves "admits he did not properly follow [JCP's] protocols for making a detention" and based his report to the police "on unsupported suspicion." (Response

Brief at 25). Burton's argument sounds in negligence. Accordingly, the court **GRANTS** JCP's motion for summary judgment on Burton's abuse of process claim.

### 3. False Light Publicity

Plaintiff alleges that her arrest "in the very public place of a Castleton Square Mall restaurant" placed her in a false light. False light publicity is a form of invasion of privacy that is defined as "'publicity that unreasonably places the other in a false light before the public.'" *Lovings v. Thomas*, 805 N.E.2d 442, 446 (quoting *Near East Side Cmty. Org. v. Hair*, 555 N.E.2d 1324, 1335 (Ind. Ct. App. 1990)). An action for false light publicity requires communication to the public at large, "'or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Id*. (quoting RESTATEMENT (SECOND) OF TORTS § 652E).

There is no evidence in this case tending to show that Burton's arrest became known to the public at large, nor evidence that JCP communicated any information about Burton to the public at large. Accordingly, the court **GRANTS** JCP's motion for summary judgment on Burton's false light publicity claim.

### 4. Defamation

Burton maintains that Officer Graves' statements in the Affidavit of Probable Cause he authored contained material misrepresentations of fact that he knew, or in the exercise of reasonable caution, should have known, to be false. To establish a claim for defamation per se, a plaintiff must establish four elements: (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *Kelley v. Tanoos*,

13

865 N.E.2d 593, 596-97 (Ind. 2007). "[M]alice exists when a defendant publishes a defamatory statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Collins v. Purdue Univ.*, 703 F.Supp.2d 862, 875 (N.D. Ind. 2010) (quoting *Shepard v. Schurz Comm., Inc.*, 847 N.E.2d 219, 225 (Ind. Ct. App. 2006)). For the reasons previously explained, there is no evidence that Officer Graves made knowingly false statements, or statements that he should have known to be false, in the Affidavit of Probable Cause. Accordingly, the court **GRANTS** JCP's motion for summary judgment on Burton's defamation claim.

### 5. False Arrest

Burton maintains that she was arrested without probable cause by JCP officers. Burton testified that she was arrested by an IMPD officer and detained at the JCP loss prevention office for approximately an hour afterward. To subject JCP officers to liability for Burton's arrest, she must show some type of agency relationship between JCP loss prevention officers and the IMPD. *Conn v. Paul Harris Stores, Inc.*, 439 N.E.2d 195, 198 (Ind. Ct. App. 1982). Burton has not established that such a relationship existed. Accordingly, the court **GRANTS** JCP's motion for summary judgment on Burton's false arrest claim.

### 6. False Imprisonment

Burton also maintains that she was falsely imprisoned at the JCP store by JCP officers. False imprisonment is defined as an unlawful restraint upon one's freedom of locomotion or the deprivation of liberty of another without consent. *Dietz v. Finlay Fine*

14

*Jewelry Corp.*, 754 N.E.2d 958, 967 (Ind. Ct. App. 2001).

As noted above, Burton was arrested at the Longhorn Steak House and detained by IMPD Officer Ivanov in the JCP loss prevention office. There is no evidence to suggest that JCP officers induced Officer Ivanov to arrest Burton without a warrant. *See Conn*, 439 N.E.2d at 198 (noting that where a private person induces an officer to make an arrest, without the offense having been committed in the presence of the officer, the party will be liable for false arrest unless he can show the charge was well founded). In fact, the evidence suggests that Officer Graves reported his observations to Officer Ivanov, and Officer Ivanov made the decision to arrest her. "[L]iability will not be imposed when the defendant does nothing more than detail his version of the facts to a policeman and ask for his assistance, leaving it to the officer to determine what is the appropriate response. . . ." *Id*. at 198-99. Because Officer Ivanov was in control of Burton's detainment, JCP is not liable for false imprisonment. Accordingly, the court **GRANTS** JCP's motion for summary judgment on Burton's false imprisonment claim.

       **7.**     **Malicious Prosecution**

Burton alleges that as a result of JCP officers' statements to the police, she was "wrongly prosecuted." (Amended Complaint ¶ 20). Burton's claim requires her to establish the following elements: (1) the defendant instituted, or caused to be instituted, a prosecution against the plaintiff; (2) the defendant acted maliciously in doing so; (3) the prosecution was instituted without probable cause; and (4) the prosecution terminated in plaintiff's favor. *Crosson v. Berry*, 829 N.E.2d 184, 189 (Ind. Ct. App. 2005). The

parties dispute whether there was probable cause to arrest Burton. JCP's involvement, according to Burton, arises from Officer Graves' Affidavit of Probable Cause.

"In Indiana, a judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent malicious prosecution suit." *Johnson County Rural Elec. Membership Corp. v. Burnell*, 484 N.E.2d 989, 992 (Ind. Ct. App. 1985). The prima facie case may be rebutted by a plaintiff with evidence showing that "the finding of probable cause was induced by false testimony or fraud, or other improper means such as the defendant withheld material facts at the hearing." *Id.* There is no evidence sufficient to rebut the presumption of probable cause in this case. At most, Officer Graves was mistaken in his account of some of the facts contained within the Affidavit of Probable Cause. A "lack of probable cause cannot be based upon a negligent failure to investigate thoroughly where there is some factual basis for bringing a claim." *Id.* at 993. In other words, a party asserting a malicious prosecution claim must present evidence from which one could infer more than "mere negligence." *Id.* Accordingly, the court **GRANTS** JCP's motion for summary judgment on Burton's malicious prosecution claim.

### 8. Intentional Infliction of Emotional Distress

Burton also brings a claim for the intentional infliction of emotional distress. To establish such a claim against an employer, the plaintiff must show that the employer (1) engaged in extreme or outrageous conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress. *See Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App.

1999) (citations omitted). Liability is found only for conduct that is extreme and outrageous. Indiana courts refer to the comments of the Restatement, Section 46:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

RESTATEMENT (SECOND) OF TORTS § 46.

The actions of JCP officers may have been negligent, but were not so extreme and outrageous as to exceed all bounds of decency tolerated in a civilized society. *See Dietz*, 754 N.E.2d at 970 (noting that although plaintiff may have been unreasonably detained and defamed by the store security manager, his actions did not constitute outrageous behavior). Accordingly, the court **GRANTS** JCP's motion for summary judgment on Burton's claim for intentional infliction of emotional distress.

### 9. Negligent Infliction of Emotional Distress

Lastly, Burton brings a claim for the negligent infliction of emotional distress. Indiana's "modified impact rule" provides that "'a plaintiff [who] sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person'" may maintain an action for that emotional trauma. *Atlantic Coast Airlines v. Cook*, 857 N.E.2d 989, 995-96 (Ind. 2006) (quoting *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991)). The direct impact sustained by the

plaintiff must be a physical one; however, the impact need not cause physical injury. *Id.* at 996). "Rather, the impact need only 'arise[] from the plaintiff's direct involvement in the tortfeasor's negligent conduct.'" *Bader*, 732 N.E.2d at 1222 (citing *Conder*, 716 N.E.2d at 435 n.3); *see also Alexander v. Scheid*, 726 N.E.2d 272, 284 (Ind. 2000) (holding that the purpose of the modified impact rule "is to confine recovery to those with 'direct involvement' in the defendant's negligent act or omission"). In other words, Burton must show that her emotional pain arose from the JCP officers' negligent conduct.

Burton does not develop this argument, except to say that she sustained a physical impact because she was "handcuffed and forcibly led away." (Response at 31). Burton was handcuffed by Officer Ivanov, not Officer Graves. Moreover, Burton does not argue, nor has her testimony established, that she suffered any emotional trauma as a result of her detention and arrest. (*See* Burton Dep. at 68) (testifying that she has not sought any psychological counseling or treatment as a result of the incident). For these reasons, the court **GRANTS** JCP's motion for summary judgment on Burton's claim for the negligent infliction of emotional distress.

### III. Conclusion

For the reasons set forth above, the court **GRANTS** JCP's Motion for Summary Judgment. (Docket # 47).

**SO ORDERED** this  25th   day of July 2012.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Christopher L. Garrison
GARRISON LAW FIRM, L.L.C.
chris@garrisonlegal.com

James Gregory Garrison
GARRISON LAW FIRM
greg@garrisonlegal.com

Miriam A. Rich
GONZALEZ SAGGIO & HARLAN LLP
richm@gshllp.com

Copy to:

Brian J. Augustine
ROETZEL & ANDRESS
250 East 5th Street, Suite 310
Cincinnati, OH 45202